UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Candy James,<br><br>   Plaintiff,<br><br>v.<br><br>GC Services, LP,<br><br>   Defendant. | Case No.<br><br><br>**COMPLAINT FOR DAMAGES UNDER THE FAIR DEBT COLLECTION PRACTICES ACT AND OTHER EQUITABLE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

## PARTIES

1. Plaintiff, Candy James ("Candy"), is a natural person who resided in Chicago, Illinois, at all times relevant to this action.

2. Defendant, GC Services, LP ("GCS"), is a Delaware limited partnership that maintained its principal place of business in Houston, Texas, at all times relevant to this action.

## JURISDICTION AND VENUE

3. Pursuant to 28 U.S.C. §1331, this Court has federal question jurisdiction over this matter as it arises under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq.

4. Pursuant to 28 U.S.C. § 1391(b), venue is proper because a substantial part of the events giving rise to this claim occurred in this judicial district.

## STATEMENT OF FACTS

5. At all times relevant to this action, GCS collected consumer debts.

6. GCS regularly uses instrumentalities of interstate commerce and the mails to collect consumer debts owed or due or asserted to be owed or due another.

7. The principal source of GCS's revenue is debt collection.

8. GCS is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

9. As described, *infra*, GCS contacted Candy to collect a debt that was incurred primarily for personal, family, or household purposes.

10. This alleged obligation is a "debt" as defined by 15 U.S.C. § 1692a(5).

11. Candy is a "consumer" as defined by 15 U.S.C. § 1692a(3).

12. In late 2020, Candy signed up for mobile service with Comcast Cable Communication Management, dba Xfinity Mobile ("Xfinity Mobile") and agreed to purchase two new Apple iPhones ("iPhones") to use with Xfinity Mobile service.

13. At the time of signing up for new service, Candy provided her current address and confirmed with Xfinity Mobile that they would mail the iPhones to her current address.

14. When the iPhones didn't arrive as scheduled, Candy notified Xfinity Mobile.

15. Despite Candy not receiving the iPhones, Xfinity Mobile demanded Candy pay the retail price of the iPhones.

16. Candy finally convinced Xfinity Mobile to open an internal investigation as to why the phones hadn't arrived.

17. Candy believed that Xfinity Mobile would research her allegations, would see the error was their fault and would credit Candy for the purchase price of the iPhones and terminate her service agreement.

18. Candy was wrong.

19. In fact, Xfinity Mobile began sending Candy demands for payments and notified Candy that the retail price of the iPhones would be automatically withdrawn as part of her autopay agreement with Xfinity Mobile.

20. Candy continued to follow up with Xfinity Mobile remaining steadfast that the iPhones were never delivered.

21. Finally, Xfinity Mobile located the missing iPhones and conceded they provided FedEx with an incorrect shipping address.

22. Shortly thereafter, Candy received email confirmation from Xfinity Mobile that her account had been credited and there was a zero balance on Candy's account.

23. This email from Xfinity Mobile led Candy to believe the saga had finally ended.

24. Candy was wrong.

25. At some point in this debacle, Xfinity Mobile hired GCS to obtain payment from Candy for the iPhones she had never received.

26. In early 2021, GCS began calling Candy on her cellular phone.

27. The first time GCS called Candy, GCS attempted to verify Candy's identity and refused to disclose the reason for their call until she disclosed her personal information to the then unknown caller.

28. Candy, following the advice of the Federal Trade Commission, notified GCS that she refused to answer GCS's questions and made it clear that she wouldn't feel comfortable answering their questions in the future.

29. After the first telephone call from GCS, Candy believed she had convinced the then perceived scammer to leave her alone.

30. Candy was wrong.

31. Based on Candy's statements, GCS had no reason to call Candy again as it knew, or had reason to know Candy was unwilling to divulge personal information to, at the time, the unknown caller.

32. Despite this, GCS continued to call Candy.

33. In fact, GCS continued to communicate with Candy in connection with the collection of a debt.

34. During these phone communications, GCS never disclosed it was a debt collector attempting to collect a debt.

35. During these phone communications, GCS refused to disclose their purpose in calling Candy.

36. During these phone communications, GCS continued to ask Candy to confirm information that Candy had previously refused to provide.

37. During these phone communications, GCS never indicated it was attempting to confirm or to correct Candy's contact information.

38. After going back and forth with GCS on multiple occasions, Candy finally thought she had convinced the likely scammer to leave her alone.

39. Candy was wrong.

40. On or around March 2, 2021, GCS sent Candy a letter ("The Letter") claiming that Candy owed Xfinity Mobile $1,553.10. (*See* "Exhibit A")

41. The Letter stated that GCS had not reported the account to any credit reporting agencies.

42. The Letter threatened that Xfinity Mobile had authorized GCS to report this debt to one or more credit reporting agencies in the future.

43. GCS's reference to Candy's future credit being affected was intended to create a sense of urgency for Candy.

44. The letter led Candy to believe that if she disputed the debt to GCS, GCS would cease collection until it satisfied GCS's obligations under the FDCPA.

45. Candy was wrong.

46. Desperate to help GCS catch their mistake prior to the debt appearing on Candy's credit report, Candy took action.

47. To notify GCS that it was attempting to collect a debt that wasn't owed, Candy wrote GCS a letter ("The Candy Letter"). (*See* "Exhibit B")

48. The Candy Letter told GCS that they had made a horrible mistake, that the debt it was attempting to collect was disputed, and that she was demanding debt validation.

49. The Candy Letter asked GCS for "proof detailing the debt" and asked that if GCS was unable to provide her with documentation showing how the debt was valid to refrain from communicating with her.

50. The Candy Letter warned GCS that if it failed to comply with her requests and her protections provided by Federal Law that she would be forced to "seek and retain legal counsel".

51. The Candy Letter also requested that if GCS "reported this debt to any credit bureau, to please acknowledge this debt is disputed".

52. The Candy Letter did not demand GCS Cease and Desist from communicating with her.

53. On or around March 22, 2021, Candy sent GCS The Candy Letter via certified mail.

54. According to the Certified Mail Tracking Receipt, GCS received the Candy Letter on March 29, 2021 at 5:00 am.

55. After making it clear that she wanted to exercise her legal rights, Candy believed that GCS would communicate her concerns to Xfinity Mobile who would in turn inform GCS that they were attempting to collect a non-existent debt.

56. Candy was wrong.

57. Despite receipt of Candy's letter, GCS failed to notify Xfinity Mobile that Candy disputed the debt.

58. Despite receipt of Candy's letter, GCS failed to undertake efforts to validate the debt.

59. Despite receipt of Candy's letter, GCS never validated the debt.

60. Despite receipt of Candy's letter, GCS began reporting the debt to the credit reporting agencies.

61. Despite receipt of Candy's letter, GCS failed to notify the credit reporting agencies that Candy had disputed the debt.

62. As of the date of filing, GCS continues to report the inaccurate debt on Candy's credit report despite Candy calling GCS ("The Call Back") and reasserting her Federal Rights.

63. By enacting the FDCPA and providing consumers the right of Validiation and Dispute, Congress was attempting to prevent exactly what GCS did, here.

64. During The Call Back, GCS attempted to excuse their behavior by explaining that its policies and procedures for handling letters containing disputes and validations were incapable of being processed when words such as "refrain" or "cease" are used by a consumer.

65. It is GCS's policy to not thoroughly review letters sent by consumers to determine if the letter is a dispute letter, a validation request letter, a cease and desist letter, or any combination of those correspondences.

66. Acting in conformity with those policies and procedures in this case, GCS failed to realize that The Candy Letter was a debt dispute letter.

67. Acting in conformity of those policies and procedures in this case, GCS believed The Candy Letter was a Cease and Desist letter.

68. The Candy Letter was not a Cease and Desist letter.

69. GCS's policies and procedures regarding the handling of incoming consumer mail results in the needless harassment of consumers and the systematic ignoring of consumers notifications that it wants to enlist the protections afforded by Federal Law.

70. GCS's policies and procedures violate the FDCPA.

71. GCS's collection efforts, including, but not limited to its telephone calls, caused Candy emotional distress in the form of frustration, annoyance, aggravation and anxiety.

72. GCS's collection efforts also intruded upon Candy's privacy.

73. GCS's collection efforts caused Candy to seek and retain counsel to defend herself from GCS and enforce her Federal rights.

74. GCS's collection efforts caused her credit file with the credit reporting agencies to be inaccurate and caused her credit score to drop 34 points.

## COUNT ONE

### Violation of the Fair Debt Collection Practices Act

75. Candy re-alleges and incorporates by reference Paragraphs 5 through 74 above as if fully set forth herein.

76. GCS violated 15 U.S.C. § 1692c(b) by communicating with a credit reporting agency when it was prohibited by law to engage in such communication prior to validating the debt.

## COUNT TWO

### Violation of the Fair Debt Collection Practices Act

77. Candy re-alleges and incorporates by reference Paragraphs 5 through 74 above as if fully set forth herein.

78. In order to establish a violation of Section 1692d of the FDCPA, a consumer need not prove intentional conduct by the debt collector. *See Ellis v. Solomon & Solomon, P.C.*, 591 F.3d

130, 135 (2nd Cir. 2010); *Horkey v. J.V.D.B. & Assocs., Inc.*, 333 F.3d 769, 774 (7th Cir. 2013) ("[Plaintiff] points to no evidence in the record regarding [Defendant's] intent, which is just as well, because intent is irrelevant" in a § 1692d claim).

79. "Instead, applying an objective standard, as measured by the 'least sophisticated consumer,' the consumer need only show that the likely effect of the debt collector's communication or conduct could be construed as harassment, oppression or abuse." *See Lee v. Credit Mgmt., LP*, 846 F. Supp. 2d 716, 721 (S.D. Tex. 2012).

80. The likely effect of GCS's debt collection efforts, as measured by the "least sophisticated consumer" standard, was "to harass, oppress, or abuse" Candy.

81. GCS violated 15 U.S.C. § 1692d by engaging in conduct the natural consequence of which is to harass, oppress, or abuse Candy in connection with the collection of the debt.

## COUNT THREE

### Violation of the Fair Debt Collection Practices Act

82. Candy re-alleges and incorporates by reference Paragraphs 5 through 74 above as if fully set forth herein.

83. A debt collector's intent to violate the FDCPA may be inferred by its maintenance of policies and procedures which, in themselves, violate the FDCPA. *See Anchondo v. Anderson, Crenshaw & Associates, L.L.C.,* 256 F.R.D. 661, 671 (D.N.M. 2009); s*ee also Kromelbein v. Envision Payment Sol., Inc.*, 2013 WL 3947109, *7 (M.D. Penn. Aug. 1, 2013)("company policy can be just as much a violation of [FDCPA] as the rogue act of an individual employee. If anything, a company policy that violates the FDCPA is a more egregious transgression because it indicates endemic, rather than isolated, disregard for debtor rights."); *citing Edwards v. Niagara Credit Sol., Inc.*, 586 F. Supp. 2d 1346, 1354 (N.D. Ga. 2008)

(awarding maximum damages in part because conduct was company policy, thereby making it routine and frequent).

84. GCS's policies and procedures, as described in Paragraphs 57 through 70 *supra*, constitutes "conduct the natural consequence of which is to harass, oppress, or abuse" consumers.

85. GCS's practice, therefore, violates Section 1692d of the FDCPA, which provides:

> A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt.

*See* 15 U.S.C. §1692d.

86. Because GCS's practice, in itself, violates the FDCPA, it reflects an intent to harass consumers generally.

## COUNT FOUR

### Violation of the Fair Debt Collection Practices Act

87. Candy re-alleges and incorporates by reference Paragraphs 5 through 74 above as if fully set forth herein.

88. GCS violated 15 U.S.C. § 1692e by using false, deceptive, or misleading representations or means in connection with the collection of the debt.

## COUNT FIVE

### Violation of the Fair Debt Collection Practices Act

89. Candy re-alleges and incorporates by reference Paragraphs 5 through 74 above as if fully set forth herein.

90. GCS violated 15 U.S.C. § 1692f by using unfair or unconscionable means to collect the debt.

## COUNT SIX

### Violation of the Fair Debt Collection Practices Act

91. Candy re-alleges and incorporates by reference Paragraphs 5 through 74 above as if fully set forth herein.

92. GCS violated 15 U.S.C. § 1692g by continuing its efforts to collect the debt without first validating the debt pursuant to Candy's written request.

## JURY DEMAND

93. Candy demands a trial by jury.

## PRAYER FOR RELIEF

94. Candy prays for the following relief:

    a. Judgment against GCS for actual damages, statutory damages, and costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k.

    b. For such other legal and/or equitable relief as the Court deems appropriate.

RESPECTFULLY SUBMITTED,

Date: May 12, 2021

By:   /s/ Jeffrey S. Hyslip
Jeffrey S. Hyslip, Esq.
Hyslip Legal, LLC
1309 Park St., Suite A
McHenry, IL 60050
Phone: 614-490-4224
jeffrey@hysliplegal.com

*Attorney for Plaintiff*